UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

4:25-BK-13396

CHAPTER 11(V)

IN RE:     PROPEL TRUCKING, INC.        DEBTOR IN POSSESSION

**MOTION TO USE CASH COLLATERAL OF PORTER BILLING SERVICES, LLC, GRANT ADEQUATE PROTECTION & NOTICE OF OPPORTUNITY TO OBJECT**

COMES NOW THE DEBTOR IN POSSESSION, and for its motion states:

1. That this court has jurisdiction over this core-proceeding matter pursuant to 28 USC §§157 and 1334, 11 USC §363 and Rules 4001 and 9014 FRBP.

2. The Debtor commenced its voluntary chapter 11 case on 2nd October 2025 and the Debtor remains as Debtor-in-Possession. Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor continues to manage its business and financial affairs as debtor in possession. No creditors' committee has been appointed in the case.

3. The Debtor owns post-petition accounts receivable. Pre-petition and consensually the Debtor contracted with Porter Billing Services LLC d/b/a Porter Freight Funding ("Porter") for Porter to provide receivables factoring services through the purchase of Debtor's accounts receivables and Porter and the Debtor desire to continue the factoring arrangement per its pre-petition contract terms pursuant to the *Recourse Receivables Purchase and Security Agreement* ("Agreement") that is attached hereto and is incorporated by reference herein as Exhibit A.

4. The operation of the Debtor produces revenue from operations that is cash collateral. The estimated claim of Porter for all the Debtor's indebtedness is at the time of filing of the petition is estimated to be $29,609.00.

5. The Debtor seeks authorization to continue to factor with Porter under the terms of the Agreement and to use the cash collateral pursuant to the Agreement on both an interim and final basis. Such use, when authorized, will remain in force and effect until the confirmation of a subsequently proposed Plan of Reorganization or Plan of Liquidation, or until the case is converted to a case under chapter 7, or is dismissed.

6. The Debtor proposes to grant Porter a super-priority claim and a first priority security interest in all of Debtor's accounts and the collateral set forth in the Agreement as adequate protection, both an interim and final basis commencing immediately and relating back to the entry of the order for relief in this case.

7. The Debtor proposes to account monthly for the collection and expenditure of the cash collateral via the required monthly operating reporting pursuant to the regulations of to the Office of the United States Trustee.

8. Allowing the Debtor to continue the use of the cash collateral is in the best interest of all creditors and interested parties and the estate.

9. Because of this ongoing Chapter 11 proceeding, the Debtor is entitled to the continued and permitted use of the accounts receivable, accounts and all other collateral constituting "cash collateral" as contemplated by and within the scope of 11 USC 363 *et seq.*, such use being limited in scope, namely for the purposes of day-to-day operations, payment of utilities, payment of employees, and other services essential to the operation of the Debtor's operation, and otherwise as set forth in the Agreement.

10. Pursuant to Rule 4001(b)(1)(A) the Debtor has attached a proposed form of order. The proposed order attached is an interim order that the Debtor will submit to the court upon the filing of this Motion.

11. The Debtor affirmatively states that the adequate protection herein proposed is adequate protection for the interests of Porter in the Collateral.

12. The proposed interim order does not indicate that the Bankruptcy Court has given its final approval to this Motion. You may still object to the Motion within the time allowed in the Notice set forth below in this pleading. If objections are received the Bankruptcy Court will hold a hearing from which it will enter a final order based on the Court's findings of fact and conclusions of law.

13. Notice is hereby given that the Debtor intends to use cash collateral in accord with the terms of this Motion pending further orders of the court.

WHEREFORE, the Debtor prays for an order authorizing it to continue to use cash collateral on both an interim and final basis, to accord to Porter adequate protection, and for all other just and proper relief.

**PROPEL TRUCKING, INC.**     **DEBTOR IN POSSESSION**

**BOND LAW OFFICE**

By:     /s/ Stanley V Bond
         Stanley V Bond     93034
         Kathryn Worlow    2018-027
         PO Box 1893
         Fayetteville, AR 72702-1893
         (V)479.444.0255
         (F)479.444.7141
         E-mail: attybond@me.com

### NOTICE OF OPPORTUNITY TO OBJECT

Notice is hereby given that the Debtor in Possession named below has filed the foregoing MOTION TO USE CASH COLLATERAL OF PORTER BILLING SERVICES LLC.

If you have an objection to the entry of an order allowing the joint administration you may file an objection within twenty-one (21) days of the date of this notice that is written below. If any objections are received in the time allowed such objections will be set for hearing by subsequent notice. If no objections are received in the time allowed, the court may enter an order granting the motion without further notice or hearing.

Any objection must be in writing and filed with the Clerk, United States Bankruptcy Court, 35 E Mountain Street, Room 316, Fayetteville, AR 72701. A copy must also be served on the attorneys named below.

**THIS NOTICE IS DATED:**    **23ʳᴰ OCTOBER 2025**

**BOND LAW OFFICE**

By:     /s/ Stanley V Bond
         Stanley V Bond     93034
         Kathryn Worlow    2018-027
         PO Box 1893
         Fayetteville, AR 72702-1893
         (V)479.444.0255
         (F)479.444.7141
         E-mail: attybond@me.com

<u>**CERTIFICATE OF SERVICE**</u>

    I the undersigned attorney do hereby certify that the foregoing document has been served by US Mail with postage pre-paid/electronic mail or ECF notice/telefax/private courier, or by hand delivery to the persons named below all in accordance with the Federal Rules of Bankruptcy Procedure and the Local Rules of the United States Bankruptcy Court for the Eastern and Western Districts of Arkansas.

                      *US Trustee    By Electronic Notice*

Porter Billing Services, LLC  
2112 First Ave. North  
Birmingham, AL 35203

Jonathan E. Raulston  
Attorney for Porter  
ENGEL HAIRSTON—  
RAULSTON BROWN, PC  
P.O. Box 1927  
Birmingham, AL 35201  
jraulston@ehrblaw.com

Porter Billing Services, LLC  
PO Box 395  
Birmingham, AL 35201  
          *20 Largest Unsecured Creditors per Form 204*

/s/Stanley V Bond _____       Date:  <u>10-23-2025</u>

**PORTER**FREIGHT
FUNDING

**RECOURSE RECEIVABLES PURCHASE & SECURITY AGREEMENT**

| SELLER | PURCHASER |
|---|---|
| Name: **PROPEL TRUCKING, INC.** | Name: **Porter Billing Services, LLC DBA Porter Freight Funding** |
| By: *Marc Campbell* [signature] | By: _____ [signature] |
| Officer's Name Printed: **MARC CAMPBELL** | Officer's Name Printed: _____ |
| Its: **President** | Its: _____ |
| Street Address: **3305 E MAIN STREET RUSSELLVILLE, AR 72802** | Street Address: 2112 First Avenue North, Birmingham, AL 35203 |
| Mailing Address: | Mailing Address: PO Box 398, Birmingham, AL 35201 |
| Email Address: mc@propeltrucking.com | Email Address: kjenkins@porterbilling.com |
| State of Organization: **AR** | State of Organization: Alabama |
| Federal Tax ID: ✖✖6202 | Federal Tax ID: ✖✖3992 |
| State and County of Principal Office: **AR, Pope County** | State and County of Principal Office: Alabama, Jefferson County |

This RECOURSE RECEIVABLES PURCHASE & SECURITY AGREEMENT ("Agreement") is made as of the _____ day of __9/20/2024__, 20___ by and between the above-named Seller ("**Seller**") and Porter Billing Services, LLC DBA Porter Freight Funding ("**Purchaser**").

**1. DEFINITIONS.** The following terms used herein shall have the following meanings. All capitalized terms not herein defined shall have the meanings set forth in the Alabama Uniform Commercial Code:

"Accounts" – any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance, or such additional meaning as shall be given to the term Accounts under the Uniform Commercial Code as adopted in the State of Alabama.

"Accounts Transmittal" – a form supplied by Purchaser from time to time wherein Seller lists such of its Accounts as it requests that Purchaser purchase under the terms of this Agreement and to which are attached copies of all invoices which relate to the Accounts described therein.

"Advance Rate" – **per "Schedule A."**

"Balance Subject to Interest" – the unpaid balance of the Purchase Price minus the Reserve Account.

"Buy-Out Fee" – Buy-Out Fee Percent multiplied by the Face Amount of each account purchased by Purchaser from a third party.

"Buy-Out Fee Percent" – **per "Schedule A."**

"Carrier" – Motor carrier providing transportation services to Freight Broker.

"Carrier Payment Period" – time period, either Standard or Quick Option as per **"Schedule A"** subsequent to Purchase Date, upon which Purchaser will issue payment to Carrier on behalf of Freight Broker.

"Carrier Settlement" – Per load documentation, between Freight Broker and Carrier, summarizing the terms and conditions, delivery confirmation, advances, selection of the Quick Pay Option, and/or other adjustments, if any, and final calculation of Carrier payment amounts for each load.

"Clearance Days" – Three (3) business days for Account Debtors located in Alabama, and five (5) business days for Account Debtors located outside Alabama.

"Collateral" - any collateral now or hereafter described in any financing statement filed against Seller naming Purchaser as the secured party (which financing statement may describe the collateral as "All assets."), and all of Seller's personal property, both now owned and hereafter acquired, and wherever located, including, but not limited to: Accounts (including Accounts purchased by Purchaser hereunder and repurchased by Seller); Chattel Paper; Deposit Accounts; Documents; Equipment; Farm Products; Fixtures; General Intangibles; Goods; Instruments; Inventory; Investment Property; Letter or Credit Rights; and the Proceeds or Proceeds of Proceeds of all of the foregoing, including, without limitation all insurance proceeds and all claims against others for loss or destruction of or damage to any of the foregoing.

"Contract Date" – The date that this Agreement is fully executed by the parties, or in the event Purchaser purchases Purchased Accounts from the Seller the date Purchaser purchased the initial Purchased Account from Seller.

"Discount Fee" – The greater of the Discount Fee Percent multiplied by the original Face Amount of each Purchased Account, or the Minimum Factor Fee.

"Discount Fee Percent" – **per "Schedule A."**

"Dispute" – a claim by an Account Debtor that the goods or services which are the subject of a Purchased Account were not delivered or accepted in accordance with the contract between the Account Debtor and Seller, whether or not such dispute is valid.

"Eligible Account" – An Account which is acceptable for purchase as determined by Purchaser in the exercise of its reasonable sole credit or business judgment.

"Events of Default" – See Section 11.1.

"Early Termination Fee" – an amount calculated by multiplying the Minimum Monthly Fee by the number of months between the date of early termination pursuant to Section 12.4 of this Agreement, and the date the term of this Agreement would have ended provided that the Agreement was not terminated early (and prorated for any partial

**Please Initial** *M*

months). For purposes of this Agreement, the Minimum Monthly Fee shall be the Discount Fee Percent multiplied by the Minimum Monthly Volume listed on Schedule A attached hereto; provided, however, that in no event (including, but not limited to, the complete waiver of the Minimum Monthly Volume for all other purposes under the Agreement) shall the Minimum Monthly Volume, for purposes of calculation of the Early Termination Fee, be less than Fifteen Thousand Dollars ($15,000.00).

"Face Amount" – The face amount due on an Account.

"Freight Broker" – A Seller that arranges for the truck transportation of cargo belonging to others, utilizing for-hire carriers to provide the actual truck transportation.

"Insolvency Event" – either (i) the filing of a petition under any state or federal debtor relief or liquidation statute by or against an Account Debtor, or (ii) the failure of an Account Debtor to pay a Purchased Account within 90 days from the invoice date, so long as such failure to pay was not the result of a Dispute.

"Initial Prime Rate" – the Prime Rate in effect at the time this Agreement is initially executed.

"Interest Rate" – the Prime Rate, plus the margin set forth on the attached **"Schedule A."** If the margin set forth on Schedule A is "N/A" or not filled in, then the Interest Rate is zero.

"Late Fee" – any fee charged pursuant to Section 3.4 of this Agreement.

"Maximum Amount" – **per "Schedule A."**

"Minimum Monthly Fee" – The Discount Fee Percent multiplied by the Minimum Monthly Volume.

"Minimum Monthly Volume" – **per "Schedule A."**

"Misdirected Payment Fee" – **fifteen percent (15%)** of the amount of any payment on account of a Purchased Account which has been received by Seller and not delivered in kind to Purchaser on the next business day following the date of receipt by Seller.

"Notation" – Invoice is assigned and payable to:

i. If by **CHECK**, mail to the following address:

**PORTER BILLING SERVICES, LLC DBA PORTER FREIGHT FUNDING
PO Box 440127
Nashville, TN 37244
For Account of: PROPEL TRUCKING, INC.**

Please show invoice and/or account number on check.

ii. If by <u>Wire</u> electronic remittance, to:
**Truist Bank
Memphis, TN 38120
Routing & Transit 061000104
Account Name: Porter Billing Services, LLC
Account # ▓▓▓▓▓9184**

iii. If by **ACH** electronic remittance, to:
**Truist Bank
Memphis, TN 38120
Routing & Transit 061000104
Account Name: Porter Billing Services, LLC**

### Account # 1000305429184

"Obligations" – all present and future indebtedness and obligations owing by Seller to Purchaser whether or not for the payment of money, whether or not evidenced by any note or other instrument, whether direct or indirect, absolute or contingent, due or to become due, joint or several, primary or secondary, liquidated or un-liquidated, secured or unsecured, original or renewed or extended, including but not limited to any obligations arising pursuant to other financial accommodations; and all principal, interest, late charges, fees, origination fees, misdirected payment fees, invoice processing fees, wire transfer fees, electronic fund transfer (ACH) fees, fuel card loading fees, buy-out fees, expenses, fuel charges, attorneys' fees and accountants' fees chargeable to Seller or incurred by Purchaser in connection with this Agreement and/or the transaction(s) related thereto.

"Parties" – Seller and Purchaser.

"Prime Rate" – the Prime Rate as used herein shall be the greater of the prime rate as published in the Wall Street Journal as the "Prime Rate" (base rate on corporate loans posted by at least 70% of the 10 largest U.S. banks) or the Initial Prime Rate.

"Purchase Price" – The Face Amount less the Discount Fee, or, in the event of accounts purchased by Purchaser from third parties, the Face Amount less the Buy-Out Fee.

"Purchased Accounts" – Accounts purchased hereunder which have not been repurchased.

"Quick Payment Discount" – Carrier Quick Pay Fee as per **"Schedule A"** which is deducted from a Carrier's payment if the Carrier elects the Quick Option Carrier Payment Period.

"Recourse Account" – shall mean the portion of any Purchased Account that remains unpaid for more than the Repurchase Period, or any portion of any Purchased Account that Purchaser determines no longer an Eligible Account.

"Repurchase Period" – **per "Schedule A."**

"Repurchased" – an Account has been repurchased when Seller has paid to Purchaser the then unpaid Face Amount upon demand by Purchaser under the terms hereof.

"Required Reserve Amount" – the Reserve Percentage multiplied by the unpaid balance of Purchased Accounts.

"Reserve Account" – a bookkeeping account on the books of the Purchaser representing an unpaid portion of the Purchase Price, maintained by Purchaser to ensure Seller's performance with the provisions hereof.

"Reserve Percentage" – **per "Schedule A."**

"Reserve Release Frequency Period" – The time period during which Seller may make one request that the funds in the Reserve Account in excess of the Required Reserve Account be paid to Seller. The time period for the Reserve Release Frequency Period is specified in **"Schedule A."**

"Reserve Shortfall" – The amount by which the Reserve Account is less than the Required Reserve Amount.

2. **SALE; PURCHASE PRICE; BILLING; RESERVE**

Please Initial ⎡ M ⎤ —DS

2.1 <u>Assignment and Sale</u>. Seller shall sell to Purchaser as absolute owner, with full recourse, such of Seller's Accounts as are listed from time to time on Accounts Transmittals. Each Accounts Transmittal shall be accompanied by such documentation evidencing the Account as Purchaser shall from time to time request. Purchaser may purchase from Seller such Accounts as Purchaser determines to be an Eligible Account, so long as the total outstanding Face Amount of Purchased Accounts does not exceed, before and after such purchase, the Maximum Amount. Purchaser shall incur no liability to Seller for refusal to purchase an Account determined not to be an Eligible Account. All Accounts Transmittals, whether or not it is specifically set forth therein, shall constitute a representation by the Seller that it is solvent, has not and is not contemplating filing bankruptcy and that all Accounts represented thereby are valid, enforceable, payable and actual and not subject to setoffs, defenses or competing claims by any party. Seller shall make all appropriate accounting entries on its books and records to reflect that Purchased Accounts have been sold to Purchaser.

2.2 <u>Purchase Price</u>. Purchaser shall pay the Purchase Price as follows. Within two (2) business days of Purchaser's receipt of an Accounts Transmittal, countersigned by the Seller, Purchaser shall pay Seller an amount equal to the Advance Rate times the Face Amount of Eligible Accounts reflected on such Accounts Transmittal whereupon the Eligible Accounts set forth in the Accounts Transmittal shall be deemed purchased. The balance of the Purchase Price shall be applied to the Reserve Account and/or any Obligations then due Purchaser by Seller under this Agreement.

2.3 <u>Billing</u>. Purchaser may send a monthly statement to all Account Debtors itemizing their account activity during the preceding billing period. All Account Debtors will be instructed to make payments pursuant to the Notation.

2.4 <u>Reserve Account</u>. Purchaser may apply a portion of any Purchase Price to a Reserve Account in the amount of the Reserve Shortfall. Without limiting the foregoing, Seller shall pay to Purchaser on demand the amount of any Reserve Shortfall. Purchaser shall pay to Seller upon Seller's request any amount by which collected funds in the Reserve Account are greater than the Required Reserve Amount; provided that Seller shall be entitled to make such demand not more than once during each Reserve Release Frequency Period, unless otherwise agreed to by Purchaser in Purchaser's discretion. Purchaser may charge the Reserve Account with any Obligation, including any amounts due from Seller to Purchaser hereunder. Purchaser may pay any amounts due Seller hereunder by a credit to the Reserve Account. Amounts Purchaser is entitled to charge to the Reserve Account, which remain unpaid after Purchaser's demand, shall accrue Late Charges.

3. **PAYMENT. OBLIGATION OF SELLER.** While this Agreement establishes the agreement of Purchaser to purchase and pay Seller for Eligible Accounts set forth in the Accounts Transmittal, it also establishes payment and performance Obligations of Seller to Purchaser.

3.1 <u>Interest</u>. With respect to such Obligation owed by Seller to Purchaser, Seller shall pay to Purchaser Interest, at the Interest Rate on an amount equal to (i) the unpaid balance of the Purchase Price minus the Reserve Account, as such amounts change from time to time plus (ii) fees, if any, computed on the basis of a 360-day year for the actual number of days in the applicable period ("Actual/360 Computation"). The Actual/360 Computation determines the annual effective yield by taking the stated (nominal) rate for a year's period and then dividing said rate by 360 to determine the daily periodic rate to be applied for each day in the applicable period. All accrued interest shall be calculated monthly on the last calendar day of the month in which it accrues using the Interest Rate in effect as of the first business day of that month and paid by Seller on the first business day of the next month. Any change in the Interest Rate shall take place simultaneously with any corresponding change as set forth in the Wall Street Journal from time to time.

3.2 <u>Minimum Factor Fee</u>. In the event the Discount Fees associated with any particular Purchased Account is less than the Minimum Factor Fee, then Seller shall pay Purchaser in addition to those Discount Fees, the difference between the Minimum Factor Fee and the Discount Fees paid pertaining to such particular Purchased Account.

3.3 <u>Reduced Volume Fees</u>. In addition, thereto Seller shall pay to Purchaser any amount by which the actual Discount Fees in any calendar month (prorated for partial months) are less than the Minimum Monthly Fee (the "Reduced Volume Fees"), and such Reduced Volume Fees, if any, will be calculated as of the close of business on the last calendar day of each month and paid by Seller to Purchaser on the first business day of the following month.

3.4 <u>Late Charges</u>. In addition, thereto Seller shall pay to Purchaser a late fee of .09% per day on any and all amounts due to Purchaser from Seller pursuant to this Agreement until such amounts are paid in full. Late Charges will not apply to amounts due to Purchaser on Accounts (but shall apply to other amounts) unless and until Seller is obligated under this Agreement to repurchase such Accounts, at which time Late Charges will accrue until the Account and Late Charges are paid in full. Late Charges shall be paid and are due within one business day following the occurrence of the event which makes Seller obligated to Purchaser for any Late Charges.

3.5 <u>Other Amounts</u>. In addition, thereto Seller shall pay to Purchaser all other Obligations or expenses, including, without limitation, Misdirected Payment Fees, any out of pocket or internal expenses, or any wire transfer, postage, audit or returned check fees that are incurred by Purchaser or are specified on **"Schedule A"** shall be paid to Purchaser by Seller within one business day following the day such expenses are incurred by Purchaser.

4. **REPURCHASE OF ACCOUNTS.** Purchaser may require that Seller repurchase, by payment of the unpaid Face Amount thereof together with any unpaid fees relating to the Purchased Account on demand, or, at Purchaser's option, by Purchaser's charge to the Reserve Account: (i) any Purchased Account in Dispute, subject to an Insolvency Event or for which Purchaser is required to disgorge; (ii) all Purchased Accounts upon the occurrence of an Event of Default or upon the termination date of this Agreement; or (iii) any Purchased Account that remains unpaid after the expiration of the Repurchase Period. Purchaser shall retain

**Please Initial** _M_

a security interest in any Purchased Account that is repurchased.

**5. SECURITY INTEREST.** Seller grants to Purchaser a continuing first priority security interest in and to the Collateral to secure the Obligations. Seller will cooperate with Purchaser in Purchaser's obtaining control with respect to depository accounts, investment property, letter of credit rights, and/or electronic chattel paper. Seller shall take all actions appropriate to perfect the Purchaser's security interest in the Collateral and authorizes Purchaser to create and file any and all financing statements, amendments corrections or releases as are necessary to perfect and maintain its security interest.

**6. CLEARANCE DAYS.** For all purposes under this Agreement, Clearance Days will be added to the date on which any payment is received by Purchaser.

**7. AUTHORIZATION TO PURCHASER.**

7.1 Seller hereby irrevocably authorizes Purchaser and any designee of Purchaser, at Seller's sole expense, and irrevocably appoints Purchaser as Seller's attorney in fact to exercise at any times in Purchaser's or such designee's discretion and in Seller's name all or any of the following powers until all of the Obligations have been paid in full: (a) receive, take, endorse, assign, deliver, accept and deposit, in the name of Purchaser or Seller, any and all cash, checks, commercial paper, drafts, remittances and other instruments and documents relating to the Collateral or the proceeds thereof, (b) take or bring, in the name of Purchaser or Seller, all steps, actions, suits or proceedings deemed by Purchaser necessary or desirable to effect collection of or other realization upon the Accounts and other Collateral, (c) after an Event of Default, change the address for delivery of mail to Seller and to receive and open mail addressed to Seller, (d) after an Event of Default, extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all Accounts or other Collateral which includes a monetary obligation and discharge or release any Account Debtor or other obligor (including filing of any public record releasing any lien granted to Seller by such Account Debtor), without affecting any of the Obligations, (e) file against Seller in favor of Purchaser financing statements or amendments with respect to the Collateral, which may describe the Collateral as "All Assets" of Seller, (f) pay any sums necessary to discharge any lien or encumbrance which is senior to Purchaser's security interest in the Collateral, which sums shall be included as Obligations hereunder, and in connection with which sums the Late Charge shall accrue and shall be due and payable, (g) file in the Seller's or Purchaser's name or both any mechanic's lien or claim under a payment bond connected to the goods or services of Seller; and (h) at any time, irrespective of whether an Event of Default has occurred, without notice to or the assent of Seller, notify any Account Debtor obligated with respect to any Account, that the underlying Account has been assigned to Purchaser by Seller and that payment thereof is to be made to the order solely to Purchaser.

7.2 Seller hereby releases and exculpates Purchaser, its officers, employees and designees, from any acts under this Agreement or in furtherance thereof whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for willful misconduct. In no event will Purchaser have any liability to Seller for lost profits or other special or consequential damages.

7.3 Seller authorizes Purchaser to initiate electronic debit or credit entries through the ACH system to any deposit account maintained by Seller to satisfy any of the Obligations.

**8. COVENANTS BY SELLER.**

8.1 Absent written notice from Purchaser to Seller, and automatically, without notice, after an Event of Default, Seller shall not, without the prior written consent of Purchaser in each instance, (a) grant any extension of time for payment of any of the Accounts or any other Collateral which includes a monetary obligation, (b) compromise or settle any of the Accounts or any such other Collateral for less than the full amount thereof, (c) release in whole or in part any Account Debtor or other person liable for the payment of any of the Accounts or any such other Collateral, or (d) grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any of the Accounts or any such other Collateral.

8.2 From time to time as requested by Purchaser, at the sole expense of Seller, Purchaser or its designee shall have access, during reasonable business hours if prior to an Event of Default and at any time if on or after an Event of Default, to all premises where Collateral is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, including Seller's books and records, and Seller shall permit Purchaser or its designee to make copies of such books and records or extracts there from as Purchaser may request. Without expense to Purchaser, Purchaser may use any of Seller's personnel, equipment, including computer readable media, supplies and premises for the collection Accounts and realization on other Collateral as Purchaser, in its sole discretion, deems appropriate. Seller hereby irrevocably authorizes all accountants and third parties to disclose and deliver to Purchaser at Seller's expense all financial information, books and records, work papers, management reports and other information in their possession relating to Seller.

8.3 Before sending any invoice evidencing an Account to the Account Debtor, Seller shall mark same with the Notation, or such other notation as Purchaser shall have advised Seller in writing.

8.4 Seller shall pay when due all payroll and other taxes, and shall provide proof thereof to Purchaser no less than ten days after the filing in such form as Purchaser shall reasonably require on no less than a quarterly basis, and, more often, if requested by Purchaser.

8.5 Seller shall not, without the prior written consent of Purchaser suffer to exist any lien (including any encumbrance or security interest) of any kind upon any of its assets, whether now owned or hereafter acquired.

8.6 Seller shall not change its state of incorporation or organization; consolidate or merge with another entity; change its name; or transfer, sell, lease or assign any of its assets out of the ordinary course of business to another entity without Purchaser's written consent and at least thirty (30) days prior to any such proposed change.

Please Initial  M

8.7 If payment of any Purchased Account, or Recourse Account is made directly to Seller, such payment shall be deemed to have been received in trust for Purchaser, and Seller shall not deposit or convert such funds and by the next banking day following the date of receipt, shall send the same, properly endorsed, if necessary, to the "Notation" designated herein. In the event Seller at any time cashes or deposits to its own account a payment on any Purchased Account received directly, such action by Seller shall be considered a breach of this agreement and if not returned immediately, subject to both criminal and civil remedies.

8.8 Seller shall maintain insurance on all insurable property owned or leased by Seller in the manner, to the extent and against at least such risks (in any event, including but not limited to fire and business interruption insurance) as usually maintained by owners of similar businesses and properties in similar geographic areas. All such insurance shall be in amounts and form and with insurance companies acceptable to Purchaser in its sole discretion, with Purchaser shown as additional insured. Seller shall furnish to Purchaser upon written request, any and all information concerning such insurance carried. All policies of insurance shall provide for not less than thirty (30) days prior written cancellation notice to Purchaser.

8.9 Seller is solely responsible for paying all expenses of the Seller's business including by not limited to the timely filing and depositing on all payroll tax contributions, required or withholding levied or fixed by any governmental authority of Seller's permanent and temporary employees.

8.10 Seller shall indemnify Purchaser from any loss arising out of the assertion of any avoidance claim or preference action initiated under the United States Bankruptcy Code and shall pay to Purchaser on demand the amount thereof. Seller shall notify Purchaser within two business days of Seller becoming aware of any avoidance claim or preference action. The Seller's duties with regard to avoidance claims or preference actions shall survive the termination of this Agreement.

9. **ACCOUNT DISPUTES.** Seller shall notify Purchaser promptly of and, if requested by Purchaser, will settle all Disputes concerning any Purchased Account, at Seller's sole cost and expense. However, Seller shall not, without Purchaser's prior written consent, compromise or adjust any Purchased Account or grant any additional discounts, allowances or credits thereon. Purchaser may, but is not required to, attempt to settle, compromise, or litigate (collectively, "Resolve") the Dispute upon such terms as Purchaser in its sole discretion deem advisable, for Seller's account and risk and at Seller's sole expense. Upon the occurrence of an Event of Default Purchaser may resolve such issues with respect to any Account of Seller.

10. **REPRESENTATION AND WARRANTY.** Seller represents and warrants that: it is fully authorized to enter into this Agreement and to perform hereunder; this Agreement constitutes its legal, valid and binding obligation; Seller is solvent and in good standing in the state of its organization; Seller's state of incorporation or organization and exact legal name are set forth in the box of this Agreement; Seller's chief executive office is located at the address set forth in the box of this Agreement; and the Purchased Accounts are bona fide existing obligations without defenses, disputes or rights to setoff or cancellation, are not sales to affiliated entities, parent companies or subsidiaries of the Seller and Seller has received no notice or otherwise learned of any actual or imminent bankruptcy, insolvency or material impairment of the account debtors and Purchased Accounts.

11. **DEFAULT.**

11.1 Events of Default. The following events will constitute an Event of Default hereunder: (i) Seller defaults in the payment of any Obligations, (ii) Seller or any guarantor of the Obligations becomes subject to any debtor-relief proceedings, (iii) any such guarantor fails to perform or observe any of such guarantor's obligations to Purchaser or shall notify Purchaser of its intention to rescind, modify, terminate or revoke any guaranty of the Obligations, or any such guaranty shall cease to be in full force and effect for any reason whatever, (iv) Seller breaches any present or future covenant or agreement contained in this Agreement, or any other present or future contract or agreement with the Purchaser, or (v) Purchaser for any reason, in good faith, deems itself insecure with respect to the prospect of repayment or performance of the Obligations.

11.2 Effect of Default. Upon the occurrence of any Event of Default, in addition to any rights Purchaser has under this Agreement or applicable law, with or without notice to Seller, Purchaser may immediately terminate its duties under this Agreement, at which time all Obligations shall immediately become due and payable without notice and purchaser shall have the right to withhold any payments due to Seller until such times as all the Obligations are satisfied and paid in full. In addition, Purchaser shall have all of the rights of a secured party under the Uniform Commercial Code, including without limitation the right to take possession and control of any Collateral and sell the same either collectively or in lots at one or more private or public sale and Seller will remain liable for any deficiency. If Purchaser sells any of the Collateral upon credit, Seller will be credited only with payments actually made by the purchaser of the Collateral, received by Purchaser and applied to the indebtedness of the purchaser. In the event the purchaser of the Collateral fails to pay for the Collateral, Purchaser may resell the Collateral, and Seller will be credited with the proceeds of the sale. Purchaser may but shall not be required to proceed against Collateral but may proceed against the Seller or any guarantor of Seller and the Obligations directly. Purchaser waives any waivable rights it may have to marshalling of assets.

11.3 No Waiver. Any failure to or decision by Purchaser not to exercise all of its rights upon an Event of Default shall not constitute or be deemed a waiver of such rights as to current or future Events of Default. Any rights and remedies of Purchaser herein against the Seller or any guarantor of Seller or the Obligations are cumulative and not alternative.

12. **TERMS**

12.1 The initial term ("Initial Term") of this Agreement shall begin on the Contract Date and continue for two (2) years, unless earlier terminated pursuant to the terms and conditions contained herein. This Agreement will automatically renew for successive two (2) year terms (each a "Renewal Term" and collectively with the Initial Term the "Term") unless either Party provides the other Party with

Please Initial _M_

written notice of nonrenewal at least sixty (60) days prior to the end of the Initial Term or any subsequent Renewal Term. Upon termination, Seller shall pay the Obligations to Purchaser, and Purchaser shall not purchase any Accounts from Seller.

12.2 In the event during the Initial Term or any Renewal Term the current Prime Rate is in excess of the Initial Prime Rate, then the Discount Fee Percent and all other percentage amounts used in this Agreement and all Schedules thereto will be increased for the period in which the Prime Rate is in excess of the Initial Prime Rate by the number of basis points that the Prime Rate is in excess of the Initial Prime Rate.

12.3 The representations, warranties and covenants of the Seller and the remedies of Purchaser for a breach of such representations, warranties and/or covenants, shall survive the termination of this Agreement, and such termination shall not affect the rights of Purchaser to enforce any of its remedies against the Seller or against any collateral after a default by the Seller. Upon termination, the Seller shall remain fully responsible to Purchaser for any Purchased Receivables purchased prior to such termination. Additionally, Purchaser shall maintain its security interest in the Collateral until all of the Obligations have been paid in full. Both parties agree that they will sign mutual releases on the termination of this agreement and the satisfaction of all debt and obligations by the Seller to Purchaser; and that providing the debt and all obligations to Purchaser have been paid in full, and Seller has fully released Purchaser from any and all liability, Purchaser will promptly sign a UCC-3 termination statement for the Seller's use.

12.4 Either party, in its sole discretion, may terminate this Agreement at any time, for any reason, by providing at least sixty (60) days' prior written notice to the other party, whereupon this Agreement shall terminate at the end of such sixty (60) day period. As consideration for the right to terminate this Agreement early pursuant to this Section 12.4, upon an early termination of this Agreement by Seller pursuant to this Section 12.4, Seller shall pay to Purchaser the Early Termination Fee. The Parties intend the Early Termination Fee to be liquidated damages constituting compensation, and not a penalty. The Parties acknowledge and agree that damages resulting from early termination by Seller pursuant to this Section 12.4 would be impossible or very difficult to accurately estimate, and that the Early Termination Fee is a reasonable estimate of the anticipated or actual harm that may arise by such early termination.

13. **AMENDMENT.** No part of this Agreement may be changed, waived, discharged, or terminated, nor may any consent to the departure from the terms hereof be given, orally (even if supported by new consideration), but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought. Any waiver or consent so given shall be effective only in the specific instance and for the specific purpose for which given.

14. **NO LIEN TERMINATION WITHOUT RELEASE.** In recognition of Purchaser's right to have its attorneys' fees and other expenses incurred in connection with this Agreement secured by the Collateral, notwithstanding payment in full of all Obligations by Seller, Purchaser shall not be required to deliver or record any terminations or satisfactions of any of Purchaser's liens on the Collateral unless and until Seller has executed and delivered to Purchaser a general release in a form reasonably satisfactory to Purchaser.

15. **SEVERABILITY.** In the event any one or more of the provisions contained in this Agreement is held to be invalid, illegal or unenforceable in any respect, then such provision shall be ineffective only to the extent of such prohibition or invalidity, and the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

16. **RELATIONSHIP OF PARTIES.** The relationship of the Parties hereto shall be that of Seller and Purchaser of Accounts and not that of borrower and lender, and neither party is or shall be deemed a fiduciary of or to the other. This is a purchase and sale transaction, and it does not constitute financing. The rights, obligations and remedies contained herein shall inure to and be binding on the parties hereto and on their respective legal representatives, successors and assigns

17. **ATTORNEYS' FEES.** Seller is obligated to pay to Purchaser all of Purchaser's reasonable attorneys' fees, legal costs and expenses, collection, prosecution or defense costs, travel expenses, and other expenses incurred by Purchaser in either enforcing Purchaser's rights hereunder, or in being involved in a legal action related hereto, or in responding to legal process concerning Seller or any account purchased hereunder. Purchaser's reasonable attorneys' fees shall be at least 20% of the then unpaid Obligations.

18. **ENTIRE AGREEMENT.** This Agreement, including all terms and conditions specified in any of the Schedules attached hereto, supersedes all prior or contemporaneous agreements and understandings between the parties, verbal or written, express or implied, relating to the subject matter hereof. No course of dealing, course of performance or trade usage, and no parole evidence of any nature, shall be used to supplement or modify any terms of this Agreement.

19. **CHOICE OF LAW.** This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the State of Alabama.

20. **JURY TRIAL WAIVER.** THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION INVOLVING BOTH OF THEM, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

21. **LEGAL ACTION.** Any action between the Parties shall, if Purchaser so elects, be instituted in the federal or state court covering Jefferson County, Alabama (the "Acceptable Forums"). Each party irrevocably submits to the jurisdiction of the Acceptable Forums and waives all attempts to transfer to any other forums. Should any action be initiated in any other forum, Seller shall not oppose any attempt to have the action transferred to an Acceptable Forum.

22. **INDEMNIFICATION.** Seller agrees to indemnify, defend and hold Purchaser harmless from any and all claims, damages, actions, or judgments, including without limitation those for attorney's fees, which Purchaser may have to pay and defend against with respect to any third-party claims

Please Initial _M_

arising out of the transactions entered into pursuant to the terms and conditions of this Agreement.

23. **NOTICE.** All notices required hereunder must be in the form or a paper or electronic tangible record and shall be deemed received upon the earlier of actual receipt by an agent of the recipient, or the passage of a business day following electronic transmittal or delivery by express next day courier, or the passage of five business days following the mailing of the notice by first class United States Mail properly addressed to the address first set forth herein. In addition all notices required to be given to Purchaser hereunder shall also be mailed to 2112 First Avenue North, Birmingham, Alabama 35203, Attention President.

24. **TIME IS OF THE ESSENCE.** In all matters pertaining to this Agreement, time is of the essence.

Please Initial: M

RECOURSE RECEIVABLES PURCHASE & SECURITY AGREEMENT
SCHEDULE A – PRICING AND TERM SHEET

# SCHEDULE A

This schedule incorporates by reference all of the terms and conditions of the Recourse Receivables Purchase & Security Agreement dated ___9/20/2024___, 20___ by and between **Porter Billing Services, LLC dba Porter Freight Funding** (Purchaser), and **PROPEL TRUCKING, INC.** (Seller).

| | |
|---|---|
| Seller | PROPEL TRUCKING, INC. |
| Credit Facility | Recourse Receivable Purchase & Security Agreement |
| Minimum Monthly Volume | $60,000 |
| Advance Rate | 97% Of Eligible Accounts |
| Reserve Percentage | 2% Of The Unpaid Balance Of Purchased Accounts |
| Reserve Release Frequency Period | Upon Request |
| Repurchase Period | 90 Days From Invoice Date |
| Discount Fees | |

| | Initial Period | Discount Fee Percent | Period |
|---|---|---|---|
| Discount Fees<br>Interest Rate (Prime +) | Subsequent Periods | 1% | 90 Days |
| | N/A | N/A | N/A |

| | |
|---|---|
| Origination Fee | $0.00 |
| Invoice Processing Fee | Waived |
| Wire Transfer Fee | $16 |
| Electronic Fund Transfer (ACH) Fee | $3 |
| Fuel Card Loading Fee | Waived |
| Tank Card Loading Fee | $2.00 if applicable |
| Buy-Out Fee Percent | 1 % if applicable |
| Other Payment Request | N/A |
| Other Considerations | N/A |

Please Initial _M_

## SECRETARY'S CERTIFICATE

I, the undersigned hereby state that I am the duly elected, acting and qualified secretary of PROPEL TRUCKING, INC. a corporation organized and existing under and by virtue of the laws of the state of AR (the "Company"), that I am the keeper of the corporate records and seal of the Company, and that:

1. Through either an unanimous consent in lieu of a Board of Directors meeting of the Company or a properly called and held meeting of the Board of Directors of the Company, the following resolutions were duly and regularly adopted:

**RESOLVED**, that the form, terms and provisions of all of the documents and instruments in the form attached hereto executed by the Company with and/or in favor of PORTER BILLING SERVICES, LLC DBA PORTER FREIGHT FUNDING (the "Agreements"), and the transactions contemplated thereby be, and the same are, in all respects approved, and that the President, Vice President and each other officer of the Company (the "Authorized Persons"), or any of them, be, and they hereby are, authorized, empowered, and directed to execute and deliver the Agreements and any and all other agreements, documents, instruments and certificates required or desirable in connection therewith, if necessary or advisable, with such changes as they may deem in the best interest of the Company, and their execution and delivery of the Agreements, and all such other agreements, documents, instruments and certificates, shall be deemed to be conclusive evidence that the same are in all respects authorized and approved; and be it further

**RESOLVED**, that the actions of any Authorized Person heretofore taken in furtherance of the Agreements be, and hereby are, approved, adopted and ratified in all respects.

2. The above resolutions: (a) are not contrary to the articles of incorporation, articles of organization, partnership agreement, operating agreement or bylaws of the Company, as applicable, and (b) have not been amended, modified, rescinded or revoked and are in full force and effect on the date hereof.

3. The following persons are duly qualified and acting officers of the Company, duly elected to the offices set forth opposite their respective names, and the signature appearing opposite the name of each such officer is his authentic signature:

| **Name** | **Officer** | **Signature** |
|---|---|---|
| Marc Campbell | President | /s/ Marc Campbell (DocuSigned 8479FA1B6B904A2...) |
|  | Vice President |  |
| Marc Campbell | Secretary | /s/ Marc Campbell (DocuSigned 8479FA1B6B904A2...) |
|  | Treasurer |  |

IN WITNESS WHEREOF, I have executed this Certificate, this _____ day of 9/20/2024 _____, 20___.

/s/ Marc Campbell
8479FA1B6B904A2...
Marc Campbell
Secretary

[CORPORATE SEAL]

Please Initial _MC_

**UNCONDITIONAL CONTINUING GUARANTY**

---

SELLER: PROPEL TRUCKING, INC.

**INDIVIDUAL GUARANTOR(S)**

(1) MARC CAMPBELL   SSAN: [redacted]

Signature: *Marc Campbell* (DocuSigned by: 8479FA1B6BB8442...)

Street Address: 3305 E MAIN STREET

City, State: RUSSELLVILLE, AR 72802

---

To induce Porter Billing Services, LLC DBA Porter Freight Funding ("Purchaser") to purchase or to continue purchasing accounts from above named Seller, the above signed guarantors, (whether one or more, "Guarantor") hereby unconditionally and irrevocably represents, warrants, and undertakes to Purchaser as follows:

**Promise to Pay and Perform.** Guarantor absolutely, unconditionally and irrevocably, jointly and severally, guarantees to Purchaser the prompt payment and performance of all obligations of Seller (or any successor-in-interest of Seller) of every kind and character now or hereafter owed to Purchaser (the "Guaranteed Obligations").

**Guaranteed Obligations.** Guarantor acknowledges and agrees that, without notice to Guarantor and without affecting or impairing the obligations of Guarantor hereunder, Purchaser at any time by action or inaction, (a) may compromise or settle, extend the period of duration or the time for the payment, or discharge the performance of, or may refuse to, or otherwise not enforce the Guaranteed Obligations; (b) may, release all or any one or more parties obligated with respect to, the Guaranteed Obligations or any security or guaranty therefore or may grant other indulgences to Seller in respect thereof; (c) may waive, amend or modify in any manner any one or more of the Guaranteed Obligations or any security or guaranty therefore; (d) may release or substitute any guarantor, if any, of the Guaranteed Obligations; and/or (e) may enforce, exchange, release, or waive any security for the Guaranteed Obligations or any guaranty of the Guaranteed Obligations, or any portion thereof.

**Waivers by Guarantor.** Guarantor waives, to the fullest extent permitted by law, all surety ship or equitable defenses to payment under this guaranty. Without limiting the generality of the foregoing or the provisions above, Guarantor agrees that Purchaser may, from time to time, without notice or demand and without affecting the enforceability of this Guarantee or Seller's liability there under: (a) fail to perfect or maintain the perfection of, subordinate, exchange, substitute and/or transfer any security or guaranty; and/or (b) do or omit to do any other act or thing, or engage in any delay or circumstance with any person which might, but for the terms herein, constitute a discharge of Guarantor's obligations under this Guaranty. Without in any way limiting any other provision of this Guaranty, Guarantor 's obligations under this Guaranty shall not be released, limited, impaired or otherwise affected by the lack of validity or enforceability of all or any part of any Guaranteed Obligations or any other agreement or instrument, any loss of value of any security held by Seller, any defense, counterclaim or right of setoff available to Seller or any other person, or any other circumstance whether similar to or dissimilar from the foregoing which might otherwise constitute a defense available to, or a discharge of the Guarantor in respect of its obligations under this Guaranty. Purchaser may proceed in the enforcement of the Guarantor's obligations under this Guaranty independently of any other right or remedy that Purchaser may at any time hold or any security therefore, and Purchaser may proceed against the Guarantor without (a) proceeding against Seller, any other guarantor or any other person, (b) proceeding against or exhausting any security Purchaser may hold and/or (c) pursuing any other remedy Purchaser may have whatsoever. Purchaser shall have no obligation to purchase or to continue to purchase any accounts from Seller. The purchase by Purchaser of any single account from Seller after the date of execution of this Guaranty shall provide full and sufficient consideration for the execution of this Guaranty, and the Guaranty shall thereafter apply to all present and future Guaranteed Obligations.

**Incorporated Provisions.** The provision of the applicable Recourse Receivables Purchase & Security Agreement between Purchaser and Seller in the sections entitled Amendment, Severability, Attorney's Fees, Entire Agreement, Choice of Law, Jury Trial Waiver, and Legal Action apply also to this Guaranty and the Guarantor as if those provisions were set forth in full herein, which agreement Guarantor acknowledges it has read in its entirety.

Please Initial  *M* (DS)